Ranney, J.
The plaintiff was the holder of a large number of the notes issued by the German Bank of Wooster, mostly in the year 1838, and a few in the year 1840; and the defendants were officers in that instiution at the time they were issued. This suit .was brought under the act of 1816, to recover of them the amount of these notes as unauthorized bankers.
It was admitted upon the trial that the whole case turned on the point whether or not the defendants, in issuing said notes, were acting under the act of February 23, 1816, “ to incorporate certain banks therein named, and to extend the charters of existing incorporated banks ” (2 Chase Stat. 913), the fifteenth section of which incorporates “The stockholders of the German Bank of Wooster.” From the mass of documentary and other evidence given by the plaintiff, it appeared that, soon after the passage of the act referred *34 to, the company was organized and continued to do a banking business until the year 1818, when it failed and became entirely insolvent. Its organization was, however, kept up by the election *of officers, until the year 1822, when Robert Bentley and Thomas G-. Jones, with eleven other persons, were chosen directors for one year; but it does not appear that they ever were qualified or accepted the appointment. From that time to the 23d day of July, 1838, a period of more than sixteen years, no corporate act or function was performed or attempted by either the directors or stockholders, or any part of them. At the organization of the bank, six thousand shares of stock, at twenty-five dollars each, were subscribed, and before its failure about eight dollars upon each share had heen paid. At the time of its failure, the cashier was authoi’ized to purchase, for the bank, its stock at a price not exceeding the nominal value, and in this way the stockholders paid large amounts of their indebtedness to the institution, exhausting all its resources, and leaving its circulation outstanding nearly worthless. Thus it remained without funds, and without any new election of officers, in a state of entire suspension for sixteen years. At the expiration of this period, for the most iniquitous and fraudulent purposes, as subsequent events fully demonstrate, Benjamin Bentley, M. D. and H. B. Wellman attempted to galvanize it again into life, and now insist upon the protection of its charter to shield themselves and their associates from private responsibility. The instruments employed for this purpose, in the first instance, were Thomas G. Jones and Robert Bentley, two of the board of directors chosen in 1822. At the date last named, they met, and, assuming that there were vacancies, filled the board of directors by the appointment of Benjamin Bentley and ten other persons, among whom were all the defendants. These ten persons, before the 15th day of July, 1838, were not the holders of any of the stock of the old bank ; but, on that day, it appears, Benjamin Bentley, for the mere purpose of making them eligible as directors, transferred to each of them, without consideration, and without the knowledge of some of them, one share of the worthless stock then standing in his name. It fully appears from the transfer book that Thomas G. Jones was the holder of no stock in the bank after January,- 1821. This board immediately commenced operations, and, among other things, authorised the cashier, B. Bentley, to dispose of the stock -then held by the bank to any person who would pay the balance *35 due upon it; made requisitions for the payment of the stock by instalments ; and finally issued a large amount of notes for circulation. Before this was done, however, Bentley had transferred to the Wellmans 3,413 shares of the stock, that had belonged to the bank, with the understanding that 1,563 shares should be transferred to himself, which was accordingly done. At this time the bank had not one dollar of assets. All that it ever received, with a trifling exception, came from Bentley and the Wellmans, and amounted to $60,000, and is credited on the stock book under the date of August 14, 1838. This, they say, was made up of $30,000 in specie procured in Cincinnati, and $30,000 deposited with James Boyd & Co., of New York. In less than two months after this sum is credited to them, they had drawn out a much larger sum, and in July or August, 1839, the Wellmans transferred their stock to Bentley, who assumed their debt to the bank, which, with his own indebtedness, then amounted to over $91,000, the whole of which Bentley paid, when the bank again suspended, by a transfer “ of so much of his stock to the bank as would settle that amount.” He says he “ made a transfer of his stock to satisfy his own indebtedness to the bank to prevent suits from being brought against him, as a stockholder of the bank, by those who would thereafter obtain the notes and claims against it and pursue a persecuting course, particularly against him.”
In short, they claim to have paid in on the stock held by them $60,000, and confess that they drew from the bank and afterwards paid with this very same stock over 91,000 dollars ; thus making a speculation of over $31,000, while they left over $125,000 of its circulation outstanding and nearly worthless. And to complete the wreck, the directors met on the 11th of September, 1841, and assigned to Bentley all the remaining property and effects of the bank. In January, 1839, it appears from the minute book of the directors that an election of officers was held, at which all persons ^constituting the board at the July preceding, were chosen, excejDt Thomas G\ Jones, whose place was filled by E. Gallagher.
At the conclusion of the plaintiff’s evidence, the defendants moved for a nonsuit; but the motion was overruled. The court then charged the jury, in substance, that no informality in organizing under the charter could be taken advantage of to charge the stockholders as unauthorized bankers, but that there must have been a substantial organization. That filling the board, in 1838, *36 by one or two of the old directors chosen in 1822, would not affect such an organization, and that the attempted organization, in January, 1839, was illegal.
The reasons assigned for a now trial are:
First, that the court erred in refusing to nonsuit the plaintiff; second, in the charge as given, and the refusal to charge as requested ; third, that the verdict is against the law and the evidence.
From what has already been stated, it is manifest that every question raised in this case will bo solved by determining the legal effect of the attempted reorganization of the company, in July, 1838, and January, 1839. We concur fully with the judge who presided upon the trial, that mere irregularities in organizing under a charter, will not deprive the officers and stockholders of the corporation of its benefit, nor make them privately responsible. While, on the other hand, it is equally clear that, to entitle them to such protection, the provisions of the act of incorporation must bo substantially pursued. No principle of law is, at this day, better established or supported by stronger reason than that11 a corporation is strictly limited to the exercise of those powers which are specifically conferred upon it. The exercise of the corporate franchise being restrictive of individual rights, can not be extended beyond the letter and spirit of the act of incorporation.” 4 Pet. 152 ; Bank of Chillicothe v. Swayne, 8 Ohio, 286.
We will first inquire into the legal effect of the attempted reorganization of the bank by Robert Bentley and Thomas *0. Jones in July, 1838. This power is claimed under the twentieth and thirty-second sections of the act before referred to. By the first of these sections it is provided that thirteen directors shall be annually elected, on the first Monday in January in each year, “ and each director shall be a stockholder at the time of his election, and a resident within the State of Ohio, and shall cease to bo a director if he should cease to be a stockholder or to be a resident within this state.” And it was further provided by the same section that, “ if any vacancy shall at any time happen among the directors of any of the aforesaid banks, by death, resignation, or otherwise, the residue of the directors of such bank, for the time being, shall elect a director to fill the vacancy.” The thii’ty-second section allowed an election of directors to be b eld at another time than the day fixed, if it should be then neglected, and then adds : “And then the directors, for the time being, shall continue in office until their successors are *37 chosen and qualified.” It is claimed that Bentley and Jones continued in office from 1822 to 1838, and were then authorized to appoint eleven other directors and commence the performance of corporate acts. It is by no means clear that such power to reorganize the corporation, aftei’ so long a suspension of all its corporate functions, would attach to the directors, if they could be regarded as still in office. But it is perfectly clear that neither Bentley nor Jones was in office. Jones had many years before assigned all his stock, and ceasing to be a stockholder, by the positive terms of the law, he ceased to be a director. Bentley had not performed an official act for sixteen years. At the expiration of the year after his election, the bank had no affairs to be managed ; it was, to say the least of it, in a state of profound slumber. To say nothing of the absurdity of the officers of a corporation holding on after the corporation itself for every practical purpose was dissolved, we hold, upon the authority of many adjudged cases and the best elementary writers, that so long an abandonment of all official duties must be regarded as an implied resignation *of the office. Willcock on Mun. Corp. 238 ; Ang. & A. on Corp. 425.
It follows, as Jones and Bentley had no power under the law to act as directors, that they could confer none upon tbeir associates; and of course the whole together were incapable of calling forth the sleeping energies of the old corporation.
The next question arises upon the attempted election of directors in January, 1839. This was also claimed to be illegal, and so held by the court. By law, the affairs of the bank were to be managed by thirteen directors, and the concurrence of a majority was necessary to the transaction of any business. These directors, as wo have already seen, wei’c required to be stockholders, and to reside in the state. Either qualification ceasing, their office ceased. The policy of this enactment is quite obvious. The legislature supposed that the community would be best protected against fraud and mismanagement of the affairs of the bank by committing its destiny to persons within the reach of our laws, and interested in its capital. They gave the stockholders no power whatever to invest any other persons with the corporate power created by the act of incorporation. Did the stockholders of the bank invest with the power of directors the persons chosen by the election of 1839 ? .That the persons chosen were nominally stockholders, is not denied, but that at least nine of the number were made so by a base fraud, *38 and had no real interest, is most manifest. This is clearly proven by the affidavits of the defendants themselves, taken in another proceeding, and read in evidence upon the trial. M. D. Wellman says : “ It is the impression of deponent that, in order to obtain a board of directors, stock was transferred to several individuals to make them eligible as directors.” S. Bentley says, “he paid no consideration for his shares, and has not been called upon for the payment of the same, either by instalments or otherwise; that the transfer was made to him at the time’ he was appointed director, and he believes for that purpose.” William Childs says, “ that stock enough to make him eligible as director was transferred *to him by Benjamin Bentley; and that the understanding was, that deponent was not to pay for his stock at that time, nor has he paid anything on the same.” This circumstance, coupled with the fact that every safeguard provided by the law for the security of the public was entirely disregarded, while all these persons not only paid their own debts to the institution after its failure, in its depreciated paper, but also received in exchange for it the obligations due to the bank, can not leave a doubt upon the mind that the whole scheme was a joint conspiracy to defraud the public, and a most palpable fraud upon the law under which they professed to act. jCan that same law be set up by them to protect themselves from (private responsibility to those they have thus defrauded? Can I they take advantage of their own wrong? Can the law tolerate a ^ fraud upon itself?
These questions are most forcibly and pointedly answered in a case between these same parties reported in 15 Ohio, 666. The ( court there say : “ A valid act of incorporation, or an invalid and pretended right to exercise corporate functions, is alike powerless ( to secure the guilty from the consequences of their fraudulent conduct, where it has been knowingly resorted to as the mere means ( of chicane and imposition, and used to facilitate the work of deception and injury. Were it otherwise, it would be a reproach to the ^ law.” And again, it is said : “ If the defendants, with the design to e defraud the public generally, have knowingly combined together, and held forth false and deceptive colors, and done acts which are 1 wrong, and have thereby injured the plaintiff, they must’make him | whole by responding to the full extent of that injury, and they can not place between him and justice, with any success, the charter of ^ the G-orman Bank of Wooster, whether it be valid or void, forfeited *39 or in esse. Neither a good nor a bad thing may be falsely used for \ purposes of deception and made a scape-goat for responsibility.” ( And it is added : “Those who combined to use it for the purposes i of swindling acted for themselves rather than as agents of the i bank.”
*In Yose v. Grant, 15 Hass. 519, the Supreme Court of Massaebusotts say: “If any number of persons combine with intent to j injure and defraud another, they can not defend themselves against an action by showing that they did the act in the character of cor- j porators under any charter whatever.”
On the whole, we are unanimously of the'opinion that the charter of the G-erman Bank of Wooster was never so revived, and the corporation reorganized under it, as to afford any protection whatever to the defendants, or to relieve them from the charge of being unauthorized bankers. In coming to this conclusion, we do not at all draw in question the act incorporating that institution. To have obtained its protection, the defendants must have exercised its powers in good faith, in the manner and by the agents provided for in it. This they have not done. The motion for a new trial will be overruled, and judgment entered on the verdict.
Bartley, J., having been of counsel for one of the parties, took no part in the decision of the case.